SHARP, W., J.
Rodney McLauchlan appeals from an order which denied his motion for an injunction to prevent his former wife, Gabija, from changing her and their three children’s residence from Ponte Vedra, Florida, to Evergreen, Colorado, thereby necessitating a rearrangement of his visitation rights with the children. The parties argued at the two-day trial below, and on this' appeal, that section 61.13(2)(d), Florida Statutes, is the controlling substantive law. The trial court heard considerable testimony dealing with the six factors or considerations set forth in the statute. As noted by the trial judge, this was a difficult case to decide because the lifestyles of these parties do not fit neatly into the .normal family lifestyles our Legislature contemplated when drafting the statute nor, for that matter, into situations discussed in prior appellate case law. After reviewing the transcripts, we conclude that the trial judge did not abuse his discretion in permitting the relocation,[1] and that there is substantial evidence to support his findings.[2] Accordingly, we affirm.
In announcing his findings at the close of the testimony, the trial judge stated that he resolved any conflicts in the testimony in Gabija’s (the mother’s) favor.
I cannot find that the mother in any way, shape or form, has misled this court, has said something that wasn’t true, has been devious, I just can’t find it.
He also concluded that there were no “artificial motives” or spite on the mother’s part for seeking the relocation nor intent to wreak retribution on the father. Accordingly, in reviewing the record, we must read it in the light most favorable to Gabija, to the extent there are conflicts.
The parties are very wealthy and lived an international lifestyle. They married in 1989. Both had a Masters of Business Administration degree, worked in the banking/investment field, and had international backgrounds.[3] The first five years of their marriage, they lived in London where two of their children were born. Rodney worked for Bankers Trust Company and was in charge of the Bank’s corporate finance business in Europe, the Middle East and Africa. His job required him to travel frequently throughout that hemisphere and beyond, and to New York City.
Rodney was rarely at home in London. He would leave late Sunday or early Monday, travel all week, and return home late Friday or early Saturday. They entertained most evenings he was at home, in London, or attended social events. In the early years, Gabija frequently traveled with him. But after the children were born, she remained in London most of the time to care for them. Rodney and Gabija had an understanding in the early years of their marriage that after they had acquired four million in net assets, exclusive of real estate, they would change their lifestyle and live a more normal family life. However, after they reached that point and beyond, Rodney was unable to set his *249 very successful career aside, and that became the spoiling point in their marriage.
In 1994, the Bank transferred them to the Pacific rim. Rodney’s office was in Tokyo, but he was assigned for a few months to Singapore. The family ultimately lived in Singapore because Gabija was pregnant with their third child and she did not want to move to Tokyo with a newborn. Rodney traveled as much as ever throughout Asia.
In 1995, Rodney was reassigned to New York City, as co-head of Bankers Trust’s global investment banking business. The parties decided to live in Florida, since they were familiar with the area, and they wanted to avoid paying income taxes in New York. They originally planned to build a multi-million dollar home at Sailfish Point, in Stuart, Florida. But, despite multiple attempts at family counseling, Ga-bija felt uneasy about the parties’ marriage. Rodney was traveling as much as ever and she felt he was not involved in her life, or their children’s lives.
In 1996, the parties purchased an expensive residence in Ponte Yedra overlooking a lagoon. The children attended a Montessori school. They received an excellent education and engaged in many activities. Gabija devoted herself almost completely to the children, overseeing homework and activities in school, as well as outside school. Gabija admitted Ponte Vedra was a “paradise,” but she was not happy there. She always felt it was a transient place for her. By the end of 1996, she felt the marriage was over.
In 1997, the parties separated and a two-year divorce proceeding commenced. At this point, the parties had multi-million dollar assets. Rodney was now working for Deutsche Bank after its merger with Bankers Trust and was earning between three to five million dollars per year. They agreed Gabija would be the primary residential custodian for the children. Rodney wanted a stipulation in their settlement agreement that she would not relocate outside of St. Johns County, or Florida. She refused. They signed an agreement which provided:

Relocation of Primary Residence:

14. The wife shall furnish the husband ninety (90) days written notice of her intent to relocate the children’s primary residence outside of St. Johns County, Florida. Any relocation issue shall be determined in accordance with the Florida Statutes on .relocation and the case law pertaining thereto. The children’s primary residence shall not be relocated outside of the contiguous United States without the written consent of both parties.
During the time the parties were separated, Rodney purchased a home in Saw-grass, near Ponte Vedra, and he made more of an effort to be involved with his children. He would have them for weekend visitations when he came back from his travels. That amounted to approximately eight to nine days per month, although part of those days were travel days when he was leaving or arriving from somewhere. He employed babysitters to care for the children, but he was present in the house while they were with him, most of the time. Gabija and he were very considerate with each other and the children during this time, and included one another in the children’s lives and activities as much as possible. But when Gabija announced her intent to move to Colorado, he became hostile and more possessive. He also suddenly married a business woman who lived in Ponte Vedra, who has a son the age of his children.
Rodney testified he does not intend to retire from his job. He is young and successful and enjoys the challenge of his highly successful career. However, be *250 cause of his job and travel commitments and his new family, he argues he will have a difficult time maintaining a relationship and exercising visitation with his children should they relocate with their mother to Colorado. Gabija offered to bring the children to Jacksonville once a month for a weekend visit, to drive them to his ski condominium in Colorado a second weekend per month, and allow him generous visitation times in Florida, or wherever, during the summer and holidays. She offered various proposals which would give him more days of visitation than he had, while they were separated. Rodney refused to consider any compromise. He was simply adamant against her relocation with the children.
The final judgment of dissolution was rendered on July 16, 1999. In September 1999, Gabija told Rodney that she planned to relocate to Colorado with the children by the year 2000. She later sent a letter to Rodney confirming their conversation. This notice was in excess of the ninety days notice required in the marital settlement agreement She sought counseling on how to work out alternative visitation with him, but he would not cooperate. Rather he filed an injunctive action, seeking to prohibit Gabija’s relocation to Colorado with the children prior to a court hearing on the matter (which she did not do). He also filed a motion for Injunction Against Relocation of Minor Children, which was heard on the merits at a two-day trial conducted August 17 and 18, 2000.
The trial court made extensive findings of fact in written as well as oral form, directed to the circumstances of the parties and their children, and the factors set forth in section 61.13(2)(d):
1. Whether the move would be likely to improve the general quality of life for both the residential parent and the child.
The court agreed that the move would improve the general quality of life for both the residential parent and the children. That was because the children had spent long periods of time in Colorado on family trips in the summer and winter and they, as well as Gabija, were expert skiers. Both parents own valuable condominiums in ski areas nearby: Rodney in Beaver Creek and Gabija at Vail. They bought their first condominium in 1992. They have spent all their major family holidays there and many summer weeks. During the divorce, Rodney wanted to keep his condominium mainly for “continuity” for the children.
Gabija also testified how much the children love Colorado and the Colorado lifestyle. They were always sad to leave Colorado and return to Florida. The court concluded, based on her testimony, that the children have spent an “inordinate amount of time” in Colorado during the summer, and they enjoy outdoor activities year round, including hiking, skiing and mountain biking.
Gabija testified she has loved Colorado since she was a child and vacationed there with her family. It is a spiritual thing. She told Rodney in 1995 she would like to live there and if she died, to have her ashes scattered there. She testified she was much happier and felt more energy in Colorado than in Florida. She also testified she has an asthmatic condition that affects her in Florida, for which she had to take a steroid inhaler. In Colorado, she does not have that problem.
She testified she and the children would be very sad if they could not live in Colorado. The court concluded: “It is clear to the Court the Mother has never been happy in the Ponte Vedra area, especially when her schedule must accommodate the Father’s international work schedule and return to the Ponte Vedra area on the weekends.”
*251 Unlike most relocation cases, there is no practical reason for Gabija’s move to Colorado, such as a better job, a new marriage and move to live with a spouse, or to obtain further education, etc.[4] This family is financially so well set that they could live anywhere, and in the finest of facilities. Gabija has no need for a job or further education. But surely “quality of life” also encompasses aesthetic things, spirituality, and enhanced happiness based on living in a'beautiful place and engaging in activities one truly enjoys. We conclude the evidence supports the trial judge’s determination that Gabija’s desire to move to Colorado is not a whim, that she will be much happier living there, and that the children will also. As a result, their quality of life, as high as it is in Ponte Vedra, will be enhanced in Colorado.

2.The extent to which visitation rights have been allowed and exercised.

The court found, based on substantial testimony, that Gabija was very generous in allowing visitation with Rodney over and above what was required in the Marital Settlement Agreement. Many witnesses testified and complimented Gabija because she encourages interaction with, the children and includes Rodney in family activities. She testified she thinks it is vitally important that the children have a good relationship with their father.
The court also found that Gabija offered generous visitation to Rodney after the relocation, including flying with the children once a month to Jacksonville, for a weekend visitation with him, and on another weekend in the month driving the children to Rodney’s Colorado condominium, if he chooses. The judgment also gives Rodney generous visitation rights during holidays and the summer and also encourages him to take the children with him on business trips. One reason Gabija chose Evergreen was because of its proximity to an international airport so that visitation could be facilitated.
3. Whether the 'primary residential parent, once out of the jurisdiction, will be likely to comply with any substitute visitation arrangements.
The court found no problem in this regard, based on Gabija’s long track record of complying with visitation and accommodating Rodney.
4. Whether the substitute visitation will be adequate to foster a continuing meaningful relationship between the child and the secondary residential parent.
The court awarded Rodney two weekends per month, five weeks vacation visitation, to coincide with his personal vacation schedule, plus visitation during holidays. It pointed out the total days awarded would exceed the weekend visitations he had in Ponte Vedra. It concluded that would be sufficient to continue a meaningful relationship between the children and their father.
Based on the testimony at trial, Rodney’s visitations with his children during the weekends have been relatively limited in time and quality. This was due to his international work schedule. Whether Rodney chooses to adjust his schedule to take advantage of the generous visitation given him under this ruling is frankly up to him.
5. Whether the cost of transportation is financially affordable by one or both parties.
These parties have no financial constraints, can well afford any required *252 transportation costs, and the court so found.
6. Whether the move is in the best interests of the children.
The court found that the move is in the best interests of the children because Gabija had consistently placed their best interests first. It also found that both the mother and children yearn for Colorado and are acclimated to Colorado. The fact that the father also has a ski condominium in Colorado nearby their new home will allow them to keep in contact and visit him.
As noted above, there is no purely practical or economic reason the children’s best interest will be served by the relocation. They were superbly cared for in Ponte Vedra. However, the testimony supports the court’s conclusion that their living conditions will be enhanced in Colorado, by allowing them to live in the setting they love most. Since their mother will also experience more joy, energy and happiness living in Colorado and they have her 100% care and attention, they will benefit from her freedom of being able to live where she chooses to live. The court stated that were she forced to remain in Ponte Vedra, she would not be happy or fulfilled. Since the children live with her full time, they would not be happy either. We agree that based on these findings, the relocation was in the children’s best interests.
AFFIRMED.
HARRIS, J., concurs specially with opinion.
COBB, J., concurs in result only.

. Jones v. Jones, 633 So.2d 1096 (Fla. 5th DCA 1994).

. Gray v. Martin, 730 So.2d 426 (Fla. 5th DCA 1999); Baldwin v. Baldwin, 576 So.2d 400 (Fla. 5th DCA 1991).

. Rodney’s parents were from Europe, but he was raised in Brazil. Gabija’s parents were originally from Lithuania, having relocated to Chicago after World War II.

. Gerov v. Holter, 731 So.2d 152 (Fla. 4th DCA), rev. denied, 743 So.2d 12 (Fla.1999); Wood v. Wood, 715 So.2d 1175 (Fla. 5th DCA 1998); Landingham v. Landingham, 685 So.2d 946 (Fla. 1st DCA 1996).